UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANGINOUT, INC., a Delaware corporation,<br><br>     Plaintiff,<br><br>v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>     Defendant. | Case No.13cv2811 AJB (NLS)<br><br>ORDER:<br><br>(1) DENYING HANGINOUT'S MOTION FOR PRELIMINARY INJUNCTION, (Doc. No. 12); and<br><br>(2) DENYING GOOGLE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT, (Doc. No. 23). |

  On November 26, 2013, Hanginout, Inc. ("Hanginout") filed this action against Google, Inc. ("Google") alleging trademark infringement, federal unfair competition, and California statutory and common law unfair competition.[1]  (Doc. No. 1.)  In the First Amended Complaint, Hanginout alleges that it has used the HANGINOUT mark in commerce to market its interactive video-response platform since at least March 2010, and that Google's use of the HANGOUTS mark to market its video-response platform, which is substantially similar if not identical to Hanginout's product, infringes on Hanginout's common law trademark rights.  (Doc. No. 14.)

---

[1] Google filed a motion to dismiss the original complaint on January 10, 2014, (Doc. No. 9), which was deemed moot after Hanginout filed the First Amended Complaint on January 28, 2014, (Doc. No. 14).

Currently before the Court are Hanginout's motion for preliminary injunction filed on January 22, 2014, (Doc. No. 12), and Google's motion to dismiss the First Amended Complaint filed on February 28, 2014, (Doc. No. 23). Hanginout's motion for preliminary injunction seeks to enjoin Google from using the HANGOUTS mark on the Internet in connection with its social media platform, either nationwide or limited to California. The Court heard oral argument on both motions on April 25, 2014. (Doc. No. 41.) For the reasons set forth below, the Court DENIES Hanginout's motion for a preliminary injunction and DENIES Google's motion to dismiss.

## BACKGROUND

### I.    Factual Background

Hanginout is a technology based Delaware corporation that has developed mobile video and social media based communication products since at least 2009.[2] (Doc. No. 14 ¶ 10.) At issue in this litigation is Hanginout's interactive video response platform HANGINOUT, which enables users to create, promote, and sell their own brands by engaging directly with potential customers via pre-recorded video messages and/or video profiles. (*Id.* at ¶¶ 12–14.) The HANGINOUT platform also includes a "Q&A" function, wherein users can exchange questions and personal video responses from anyone in the application at any time. (*Id.* at ¶¶ 14–15.)

### A.    The HANGINOUT mark

Hanginout alleges it adopted the HANGINOUT word and design marks in connection with its social media based platform as early as November 2008, and that for the first year or so developed business plans and the technological know-how to turn its vision into a reality. (*Id.* at ¶ 11; Doc. No. 12, Malone Decl. ¶¶ 6, 7, Ex. 1.) Thereafter, beginning in early 2010, Hanginout began marketing the HANGINOUT platform through social media and various partnerships with celebrities and professional athletes. (Doc. No. 4 ¶¶ 16-17.) For example, in March 2010, Hanginout's company Facebook

---

[2] Hanginout incorporated in the state of Delaware in 2011. **(**Doc. No. 14 at ¶ 1.) Its principal place of business is located at 2712 Jefferson Street, Carlsbad, CA 92008. (*Id.*)

profile containing the HANGINOUT mark was uploaded and Hanginout partnered with professional athlete Shawne Merriman to shoot a HANGINOUT promotional video. (*Id.*)

Approximately a year later, in or around March or April 2011, Hanginout alleges that consumers began registering for HANGINOUT profiles via Hanginout's web-based application and endorsing the product on social-media based platforms such as Twitter and Facebook. (*Id.* at ¶ 18.) Thereafter, Hanginout alleges it continued to market the HANGINOUT application through various social-media outlets. (*Id.* at ¶ 19.) By May 2011, Hanginout alleges that over 200 customers had registered for and used Version 1.0 of the HANGINOUT Q&A web-based platform. (*Id.* at ¶ 20.)

On July 12, 2012, Hanginout filed trademark applications for the HANGINOUT word and design marks with the United States Patent and Trademark Office ("USPTO"). (*Id.* at ¶ 21.) The USPTO assigned Application Serial No. 85674801 to the HANGINOUT word mark and Application Serial No. 85674799 to the HANGINOUT design mark.[3] (*Id.* at ¶ 22.) Both applications have since been published by the USPTO for opposition. (*Id.* at ¶ 24.) As of the date of this order, neither trademark is officially registered with the USPTO. Two months later, on September 12, 2012, Hanginout officially launched a HANGINOUT iOS application for its web-based platform on the iTunes App Store. (Doc. No. 12 at 5:2–3, 25; Doc. No. 14 ¶ 27.) Since this date, Hanginout alleges that the HANGINOUT app has received hundreds of thousands of views from individuals across the world, received celebrity media attention, has been downloaded and used by consumers across the United States, and has been featured by Apple in the iTunes application portal. (Doc. No. 12 ¶ 27.)

**B.     The HANGOUTS Mark**

By 2009, Google alleges it had already developed an internal version of what later became its HANGOUTS product, referring to the prototype as "The Hangout." (Doc.

---

[3] Hanginout attached both trademark applications to the First Amended Complaint. (Doc. No. 14, Exs. A, B.)

No. 30 at 2:24-25, Lachappelle Decl. ¶ 4.)  Thereafter, on June 28, 2011, Google made HANGOUTS accessible to the public, including it as one of several products that made up Google's products.[4]  (Doc. No. 30 at 2:26-28, Leske Decl. ¶ 3, Exs. 1-2.)  Among other features, HANGOUTS allows users to engage in live interactions with other users, including instant messaging and real-time video-conferencing.  (Doc. No. 34, Caruso Decl. ¶ 3, Ex. 1; Leske Decl. ¶¶ 3, 6.)  HANGOUTS had 50,000 unique registered users the very first day it launched and 150,000 unique registered users as of July 8, 2011.[5]  (Doc. No. 30 at 3:6, Leske Decl. ¶ 3, Ex. 1.)  Since HANGOUTS launch, Google contends that users have initiated more than ██████████HANGOUT video conferences and the app version of HANGOUTS has been installed on more than ██████████mobile devices.  (Id. at 3:6-10, Leske Decl. ¶¶ 5-6.)

On April 26, 2013, Google filed an application with the USPTO to register the HANGOUTS mark, which was assigned Application Serial No. 85916316.  (Doc. No. 14 ¶ 29.) Thereafter, in or around May 2013, Google released the HANGOUTS iTunes application for the App store.  (Doc. No. 12 at 7:2-3.)  On July 30, 2013, the USPTO suspended Google's HANGOUTS trademark application after finding that a "pending application(s) may present a bar to registration of the applicant's mark."  (Doc. No. 12, Malone Decl., Ex. 26.)

On September 12, 2013, Google launched Hangouts On Air ("HOA"), which offers users the ability to host interactive conversations with people from around the world.  (Doc. No. 29, Ex. 3.)  HOA is different from HANGOUTS because HOA is not

---

[4] At oral argument, counsel for Google provided the Court with a time line of Google's uses of "Hangouts" and "Google+ Hangouts."  This document has been marked at Court's Exhibit 1.  (Doc. No. 42.)

[5] Google asserts that by June 30, 2011, Google's official blog post announcing HANGOUTS was viewed more than 460,000 times.  (Doc. No. 30, Leske Decl. ¶ 3.)  Press reports regarding the release of HANGOUTS immediately followed, including articles and announcements by The New York Times, NBC News, CNN, Fox News, Bloomberg Businessweek, Computer World, Rolling Stone, and PC Magazine.  (Id.)

limited to ten participants and allows the public to view the live feed.[6] (Doc. No. 30, Leske Decl. ¶¶ 8–10.) Google alleges that HANGOUTS can be accessed through Gmail, Google+ websites, or through mobile applications available for Android and iOS devices. (*Id.* at ¶ 28.)

## DISCUSSION

### I. Hanginout's Motion for Preliminary Injunction

Hanginout moves to preliminary enjoin Google from using the HANGOUTS mark in its messaging and social media platforms, its Q&A platform, and cease advertising and soliciting the HANGOUTS mark in connection with its messaging platform. Because the parties' briefing focused solely on Hanginout's trademark infringement claim under the Lanham Act, the Court does not address Hanginout's federal unfair competition claim or Hanginout's statutory and common law unfair competition claims under California law.

#### A. Legal Standard

In deciding whether to issue a preliminary injunction, the court must consider: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships tips in favor of one party or the other; and (4) whether the public interest will be advanced by granting preliminary relief. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 20 (2008)). "A preliminary injunction is an extraordinary remedy" that may only be granted "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("And what is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher."). The mere possibility that a plaintiff

---

[6] The live feed is then saved on the host Google+ page and YouTube to allow editing and sharing. (Doc. No. 30, Leske Decl. ¶¶ 8–10.)

will suffer irreparable injury is insufficient. *See Am. Trucking Ass'n*, *Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (stating that following *Winter* cases suggesting a lower standard "are no longer controlling, or even viable").

## B.  Analysis

### 1.  Likelihood of Success on the Merits

To state a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must demonstrate that it is: "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark." *Herb Reed Enters.*, *LLC v. Fla. Entm't Mgmt*, *Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (citing *Grocery Outlet*, *Inc. v. Albertson's*, *Inc.*, 497 F.3d 949, 951 (9th Cir. 2007)).

### i.  Ownership of a Valid, Protectable Mark

To establish common law trademark rights in the absence of federal registration, a plaintiff must plead and prove that it is the senior user of the mark with sufficient market penetration to preclude the defendant from using the mark in a specific geographic market.[7] *See Sengoku Works Ltd. v. RMC Int'l*, *Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); *Quiksilver*, *Inc. v. Kymsta Corp.*, 466 F.3d 749, 761–62 (9th Cir. 2006) (stating that use equated to sales in a specified area); *Adray v. Adry-Mart*, *Inc.*, 76 F.3d 984, 988 (9th Cir. 1995); *Credit One Corp. v. Credit One Fin.*, *Inc.*, 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009) ("A party asserting common law rights must not only establish that it is the senior user, it must also show that it has 'legally sufficient market penetration' in a certain geographic market to

---

[7] It is undisputed that neither mark—HANGOUTS or HANGINOUT—is registered with the USPTO.  Therefore, neither are presumed valid. *See Tie Tech*, *Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) (stating that registration of a mark carries a "presumption of validity").

establish those trademark rights.")[8]  Contrary to Plaintiff's contentions, the Court finds these are two independent determinations—seniority of use and market penetration—both of which must be satisfied in the absence of federal registration.[9]

### a.    Senior User

"It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1047 (9th Cir. 1999).   Although seniority of use does not require "evidence of actual sales," *Rearden LLC v. Rearden Commerce*, 683 F.3d 1190, 1205 (9th Cir. 2012), the Ninth Circuit has stated that use of the mark must be "sufficiently public" so that the public identifies the mark with the "adopter of the mark," *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433-34 (9th Cir. 1999).  In making this determination, a court may rely on the mark's use and promotion in " 'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications,' as well as in media outlets such as television and radio." *Id.* at 434 (quoting *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996); *see*

---

[8] Hanginout contends that a presumption of nationwide ownership should exist based on Hanginout's pending federal trademark applications.  The Court does not agree. *See, e.g., CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1032 (N.D. Cal. 2008) ("[S]ince the defendant was using the mark prior to its registration, plaintiff is not entitled to a presumption that the mark is valid."); *Pollution Denim & Co. v. Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1139 (C.D. Cal. 2007).

[9] At oral argument, Hanginout suggested that market penetration in a specific geographic area is not required to assert common law trademark rights in the absence of federal registration.  The Court does not agree.  It is nonsensical that mere advertising or use of a mark in commerce could be enough to enjoin a junior user from using a similar mark anywhere in the United States—priority of use is limited to the geographic area in which the product at issue is sold. *See, e.g., Adray*, 76 F.3d at 989 ("The extent of market penetration depends upon the volume of sales, the positive and negative growth trends, the number of people who purchased the party's goods in relation to the number of potential customers, and the amount of advertising."); *Glow*, 252 F. Supp. 2d at 983 ("Generally, the senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration."); *Optimal Pets*, 877 F. Supp. 2d at 958 ("A party asserting common law rights must not only establish that it is the senior user, it must also show that it has 'legally sufficient market penetration' in a certain geographic market to establish those trademark rights.") (internal citation omitted).

*also Brookfield Commc'ns*, 174 F.3d at 1036 (stating that trademark rights can vest even before any goods are actually sold if "the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark") (internal quotations and citation omitted).

Under the framework set forth above, Hanginout contends it is the senior user of the mark based on the totality of the circumstances. Hanginout asserts that by March 2010, over a year before Google released Hangouts+ as part of the Google+ platform, and over two years before Google rebranded the platform as purely HANGOUTS, Shawne Meriman shot a HANGINOUT promotional video and Hanginout's company Facebook page was uploaded. Thereafter, by May 2011, nearly two months before Google's release of HANGOUTS+, Hanginout asserts that over 200 consumers registered for and used Version 1.0 of the HANGINOUT Q&A web-based platform. (Doc. No. 12, Malone Decl. ¶ 17.) Hanginout further argues that the marketing campaign for the HANGINOUT platform, all of which utilized the HANGINOUT mark, was aggressively and publicly pursued on a continuous basis beginning in May 2011 via LinedkIn, Twitter, and celebrity YouTube videos.

In opposition, Google contends Hanginout cannot possibly be the senior user of the mark based on Hanginout's own representations to the USPTO. Google argues that on July 12, 2012, more than a year after Google released HANGOUTS, Hanginout filed trademark applications with the USPTO asserting that it first began using the mark in commerce on June 6, 2012.[10] (Doc. No. 14 ¶ 22, Exs. A, B.) Therefore, because Hanginout previously represented to the USPTO that it first began using the mark in commerce on June 6, 2012, but now asserts an earlier "first use" date, Google argues Hanginout must prove the earlier first-use date by clear and convincing evidence. *See Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 304 n.1 (9th Cir. 1982).[11]

---

[10] Google contends it was only after it raised this priority of use argument in its first motion to dismiss that Hanginout amended its complaint. (Doc. No. 14 ¶¶ 17–20.)

[11] Both parties agree that under *Wells Fargo v. Stagecoach* a party must present "clear and convincing" evidence to establish a date prior in time than that represented to the USPTO. (Doc. No. 30 at 7:19-23; Doc. No. 36 at 3:9-11.)

Representations to the USPTO aside, Google argues Hanginout's actions fail to establish seniority of use in a nationwide market. Google maintains that similar to *Future Domain Corp. v. Trantor Sys. Ltd.*, No. C930812, 1993 WL 270522, at *8 (N.D. Cal. May 3, 1993), wherein the court found the plaintiff's advertisement at a large trade show was insufficient to establish seniority of use, here, the only evidence Hanginout provides to support its alleged aggressive marketing campaign prior to June 28, 2011 (Google's alleged first use date), are exhibits showing two promotional YouTube videos, Hanginout's company Facebook page, an announcement of the HANGINOUT preview launch on LinkedIn, a brief article in a lesser-known tech-blog called Tech Cocktail, and 48 tweets on Hanginout's company Twitter page. (Doc. No. 12 at 3, Malone Decl. ¶¶ 7, 11, 12, 15–16; Doc. No. 30, Caruso Decl. ¶¶ 4–5, Exs. 2–5.) However, Google contends none of these alleged advertising tactics are noteworthy because the article in Tech Cocktail received no likes, tweets, or shares; the endorsement on Facebook by Tech Cocktail received only two likes (one of which was from the then COO/CFO of Hanginout); the announcement of the preview on LinkedIn received only one like; and Hanginout's Twitter feed shows only 48 tweets before June 28, 2011 (18 of which were from Hanginout). As a result, Google contends Hanginout has failed to provide any evidence that a sufficient number of people actually saw or noticed its promotional efforts.[12]

Although the parties ardently dispute whether Google first began using the HANGOUTS mark in commerce as of June 2011, or whether the use did not commence until May 2013, this argument need not be resolved because the Court finds Hanginout first began using the HANGINOUT mark in commerce in or around May 2011—prior to both of Google's alleged first-use dates.[13] Therefore, because more than 200 customers

---

[12] Google asserts that Hanginout's promotional YouTube videos were poorly viewed. ( Doc. No. 30, Caruso Decl. ¶¶4–5, Exs. 2, 5.)

[13] Because Hanginout's trademark applications stated that the marks were first used in commerce "[a]t least as early as 06/06/2012," the clear and convincing standard set forth in *Wells Fargo* does not apply. (Doc. No. 36, Wagner Decl., Exs. 13, 14.)

had registered for Version 1.0 of Hanginout's web-based platform as of May 2011, which was then followed by continuous advertising and marketing of the platform under the HANGOUTS mark, this case is markedly different from *Future Domain* and *Chance v. Pac-Bel*, both of which were cited by Google. *Future Domain v. Trantor*, No. C930812, 1993 WL 270522, at *6–10 (N.D. Cal May 3, 1993) (stating that the launch of a mark at a single trade show was insufficient to show priority of use); *Chance v. Pac-Bel*, 242 F.3d 1151 (9th Cir. 1988) (finding no priority of use based on postcards that did not generate a single use of services) and, because here, Hanginout has presented evidence of its actual use and marketing of the HANGINOUT mark, in commerce, prior to the first use date of Google's HANGOUTS mark.[14]

Accordingly, the Court finds Hanginout is the senior user of the marks based on the totality of the circumstances—number of registered users, marketing via social media, and launch of iTunes app in the Apple store to name a few. *See Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) ("As long as there is a genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition."); *Dep't of Parks & Recreation v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006) ("Although mere advertising by itself may not establish priority of use, advertising combined with other non-sales activity, under our 'totality of the circumstances test,' can constitute prior use in commerce.") (internal citations omitted).

### b.     Market Penetration in a Specific Geographic Area

Establishing priority of use however is not in and of itself sufficient to bestow common law trademark rights.  To warrant immediate injunctive relief,

---

[14]   The HANGINOUT app had been viewed more than a million times (90% repeat visits) from users in every state in the U.S. (30,000 from California), it enjoyed tens of thousand of users (including high-profile celebrities and politicians), and had substantial media attention (including ESPN).  (Doc. No. 12, Malone Decl. ¶¶ 3-5, 9, 11-17, 20, 23, 24, 26, 27, 29-33, Exs. 2-7, 9, 11-12, 14, 15, 17-19.)  Hanginout also contends that of the nearly 300 YouTube views, it generated over 200 customers, thereby equating to a 65% conversion ratio.

Hanginout must also establish sufficient market penetration in a specified geographic area. *See Credit One Corp*, 661 F. Supp. 2d at 1138 ("A party asserting common law rights must not only establish that it is the senior user, it must also show that it has 'legally sufficient market penetration' in a certain geographic market to establish those trademark rights."); *Optimal Pets*, 877 F. Supp. 2d at 958 ("The first to use a mark in an area is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion.").

To determine whether Hanginout has market penetration in an identified geographic area, the court considers: (1) the volume of Hanginout's sales with regard to the product at issue; (2) the growth trends of the product both positive and negative; (3) the number of persons actually purchasing/registering for the pertinent product in relation to the total number of potential customers; and (4) the amount of advertising with the regard to the product at issue. *See Adray*, 76 F.3d at 989 (9th Cir. 1995); *Optimal Pets*, 877 F. Supp. 2d at 958. Thereafter, and only if Hanginout can establish market penetration in a specific geographic area, the Court must then assess whether Hanginout may preclude Google from utilizing the mark within Hanginout's "natural zone of expansion." *Optimal Pets*, 877 F. Supp. 2d at 958; 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 26:13 (4th ed. 2002) (stating that "in the absence of federal registration, both parties have the right to expand [use of an unregistered mark] into unoccupied territory and establish exclusive rights by being first in that territory. In effect, it is a race between the parties to establish customer recognition in unoccupied territory.").

Here, Hanginout urges the Court to find that its market penetration is either nationwide, or Southern California with a nationwide zone of expansion. In support, Hanginout asserts that: (1) it had a Facebook profile by March 2011; (2) by May 2011,over 200 consumers had registered for and used Version 1.0 of the HANGINOUT web-based platform; (3) from September 15, 2012 through December 23, 2013 the

HANGINOUT smart phone application had 30,000 visits from California[15] consumers, 7,000 visits from New York consumers, 3,500 visits from Florida consumers, 2,700 visits from Michigan consumers, 2,600 visits from Texas consumers, and a ranging number of visits from consumers in the remaining states; (4) nearly 8,000 individuals had registered for the HANGINOUT iTunes application by the filing of the preliminary injunction; and (5) various celebrities and politicians have created HANGINOUT accounts and published content utilizing the HANGINOUT platform. (Doc. No. 12 at 10–11; Malone Decl. ¶¶ 10, 20, 17, 32, Exs. 9, 19.) Therefore, Hanginout contends that because it offered and marketed its computer-based services under the HANGINOUT mark via its website and iTunes application, its customers, and therefore its market penetration, is nationwide.

In response, Google contends Hanginout has failed to submit any evidence of its actual market penetration in a specific area, and use of a mark over the Internet does not automatically implicate a nationwide market. In support, Google relies on *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 984 (C.D. Cal. 2002) (finding no market penetration because the plaintiff had presented no evidence of the "volume or level of sales in any location, nor how [the plaintiff's] market penetration compares with that of competitors"); *Credit One Corp. v. Credit One Fin., Inc*., 661 F. Supp. 2d 1134, 1137 (C.D. Cal. 2009) (stating that the plaintiff failed to show market penetration in areas where an office had closed and there was no basis for which to believe sales had occurred); and *Optimal Pets*, 877 F. Supp. 2d 953, 962 (C.D. Cal. 2012) (finding no market penetration because the plaintiff had no sales in 34 states, in 8 of the 16 states where there were sales

---

[15] The California data can be further broken down as follows: Los Angeles (4,456 visits), Carlsbad (4,191 visits), and San Diego (3,726 visits). (Doc. No. 12, Malone Decl. ¶ 45, Ex. 28.)

those sales were under $80, and the two states with "big ticket" sales all originated in a single zip code).[16]

The Court finds the cases relied upon by Google instructive, and Hanginout's failure to present any evidence as to the actual location of its registered users dispositive. First, with regard to total sales, or in this case registered users, although Hanginout represented that it had over 200 registered users of its web-based platform as of May 2011, and nearly 8,000 registered users of its iTunes application as of the filing of the preliminary injunction, Hanginout has never identified the state of residence of these alleged registered users.[17] *See Optimal Pets*, 877 F. Supp. 2d at 962 ("Thus, a sale to a customer through the internet will be considered a sale in the geographical area in which the customer is located.").[18] Hanginout's evidence of "site visits" fairs no better.[19] Although this evidence pins down the state (and city within California) of the consumer that viewed Hanginout's mobile profile, the Court is at a loss as to how these statistics

_____

[16] The *Optimal Pets* court further noted that there was a "downward trend" in sales, no evidence of "actual vis-á-vis potential purchasers," and no evidence of "continued" marketing or advertising from 2004 through 2008. *Id.* at 963–64.

[17] Hanginout conceded this point at oral argument, stating that they are not required to identify the location of their users to attain common law trademark rights. As stated below, the Court does not agree, and finds the location of Hanginout's users key to fashioning an injunction.

[18] Hanginout provided a print-out from Apple to document the total number of individuals who registered for the HANGINOUT iTunes application in 2012 and 2013. (Doc. No. 12, Malone Decl., Ex. 28.) However, this document shows that of the 9,534 individuals who downloaded the application in 2012, only 6,926 resided in the United States; and of the 2,306 individuals who downloaded the application in 2013, only 1,235 resided in the United States. (*Id.*) The document never specifies the specific geographic residence within the United States of each registered user. (*Id.*) Furthermore, Hanginout did not provide any evidence, other than the Malone Declaration, of the 200 users that registered for its web-based platform in May 2011. (*Id.*)

[19] Hanginout attached a Google Analytic Report showing that between September 15, 2015 and December 23, 2012, 61,601 total individuals visited/clicked on HANGINOUT Mobile. (Doc. No. 12, Malone Decl., Ex. 17.) This information further breaks down the number of visits between and among the various states in the United States, showing visits from every state with the highest number of visits from California (29,985), New York (7,056), Florida (3,506), Michigan (2,701), Texas (2,629), Colorado (1,283), and Illinois (1,094). (Doc. No. 12, Malone Decl., Ex. 19.) Although the total number of visits is 71,503, the Court disregards visits from individuals outside the United States.

identify the location of Hanginout's registered users. Therefore, although evidence of site visits shows that consumers are actually looking at Hanginout's website and/or products, and supports Hanginout's seniority of use argument, it is insufficient to show actual sales/registration for Hanginout's product necessary to establish market penetration.

Second, with regard to actual growth trends of the product at issue, although Hanginout never specifically commented on this factor, the Court finds the evidence submitted by Hanginout speaks for itself. For example, the Google Analytic Audience Overview report shows a dramatic decline in the overall number of views of the HANGINOUT application, with the number of visits the highest in or around October 2012, then nearly flat-lining in or around October 2013. (Doc. No. 12, Malone Decl., Ex. 17.) This analysis is then confirmed by sales statistics that were reported to Hanginout by iTunes. (Doc. No. 12, Malone Decl., Ex. 28.) These sales reports indicate that 6,926 individuals downloaded the HANGINOUT application in 2012, and that 1,235 individuals downloaded the HANGINOUT application in 2013. (*Id*.) This represents a 82.17% decline in the number of registered users, or 5,691 fewer registered users from 2012 to 2013. (*Id*.) Therefore, based on these statistics, all of which were produced by Hanginout, there appears to be a negative growth trend for the HANGINOUT product. *See Optimal Pets*, 877 F. Supp. 2d at 963.

Third, with regard to the actual number of consumers actually purchasing/registering for the product in relation to the total number of potential consumers, Hanginout once again did not produce or direct the Court to any evidence indicative of this factor. Instead, the only evidence the Court is left to consider is that 6,926 individuals registered for the HANGINOUT iTunes application in 2012, 1,235 individuals registered for the HANGINOUT iTunes Application in 2013, and that 61,601 individuals viewed HANGINOUT Mobile between September 2012 and December 23, 2013. However, as these numbers do not directly overlap, nor did Hanginout present any

evidence regarding its market share, this weighs against finding Hanginout had sufficient market penetration to warrant immediate injunctive relief.

However, with regard to marketing and advertising, Hanginout fares much better. Hanginout contends that as early as 2009, it began utilizing various means to market and advertise the HANGINOUT web-based platform. For example, Hanginout asserts that by March 2010, it began partnering with celebrities and professional athletes to create HANGINOUT profiles for their interactive social-media platforms. These individuals included Kassim Osgoode (NFL), Shawne Meriman (NFL), Ritchie Brusco (X-Games), DJ Chuckie (DJ), Eric Griggs (Music Producer), Miles McPhereson (Pastor at the Rock Church and former NFL player), Mike Hill (ESPN), Daphne Joy (Actress/Model), Jessica Burciaga (Model), Amanda Cerny (Model), Da Internez (Music Producers), and Belmont Lights (Band). (Doc. No. 12, Malone Decl. ¶ 10, Ex. 2.) Hanginout further contends that these efforts were supplemented by announcements on Twitter, LinkedIn, and the release of YouTube videos detailing key elements of the HANGINOUT plat-form. (Doc. No. 12, Malone Decl. ¶¶ 11, 13-14.) Thereafter, on October 24, 2011, San Diego mayoral candidate Carl DeMaio utilized HANGINOUT to create a "virtual town hall" for his campaign, and on July 6, 2012, professional skateboarder Ritchie Brusco launched an application utilizing the HANGINOUT platform. (*Id*. at ¶ 22, Ex. 11.) Hanginout further contends that ESPN ran an article about the Brusco application in conjunction with the upcoming X-Games, (*Id*. at ¶ 23, Ex. 12), and that on September 16, 2012, Hanginout officially launched a HANGINOUT application in the iTunes App store and Apple elected to feature the HANGINOUT app as one of its social-media based applications. (*Id*. at ¶ 24.)

Although the Court finds the evidence presented above exemplifies Hanginout's marketing and intent to use the HANGINOUT mark in commerce, none of the evidence is sufficient to support a finding of market penetration in a specific geographic market. Therefore, because marketing and advertising is but one factor to consider in determin-ing market penetration of an unregistered mark, without evidence as to the actual

location of Hanginout's registered users, the Court cannot determine Hanginout's market penetration. *See Charles Jacquin Et Cie*, *Inc. v. Destileria Serralles*, *Inc.*, 921 F.2d 467, 472 (3d Cir. 1990) ("The proper geographic scope of an injunction in a trademark infringement case is determined by examining the market penetration of the mark."). Accordingly, although the Court is cognizant of the complexities posed by the use of Internet, the Court does not agree with Hanginout that marketing, advertising, and promoting an unregistered mark over the Internet is sufficient to find nationwide market penetration. The Court also does not agree with Hanginout that it has sufficient market penetration in Southern California by virtue of the location of its office and/or the number of site views originating out of Southern California.

As a result, the Court finds Hanginout had not presented sufficient evidence to permit the Court to determine its market penetration in a specific geographic area, and as a result, the Court need not consider Hanginout's natural zone of expansion. *See*, *e.g.*, *Optimal Pets*, 877 F. Supp. 2d at 962 (quoting Brian L. Berlandi, What State Am I In?: Common Law Trademarks on the Internet, 4 Mich. Telecomm. & Tech. L. Rev. 105, 123–24 (1998) ("[T]he limits of territorial protection for a common law mark become much more difficult to define once that mark is placed on the Internet . . . mostly due to the apparent lack of 'boundaries' on the Internet."); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1128 (C.D. Cal. 2003) ("Although Echo Drain has a website, Echo Drain offers no evidence that people outside of the Dallas–Fort Worth area have accessed the website, downloaded performances from the website, or even posted messages to the website."); *Pure Imagination*, *Inc. v. Pure Imagination Studios*, *Inc.*, No. 03 C 6070, 2004 WL 2967446, at *12 (N.D. Ill. Nov. 15, 2004) ("Studios has failed to offer any specificity as to its activity in any markets in which it alleges priority rights."); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("A preliminary

injunction is an extraordinary remedy never awarded as of right.") (internal citations omitted).[20]

## ii.     Likelihood of Confusion

Although the Court has determined that Hanginout has not shown market penetration in a specific geographic area, the Court will nonetheless examine whether Google's use of the HANGOUTS mark will likely confuse the consuming public as to the source of the parties' products. A court considers eight factors to determine if there is a likelihood of confusion:

> (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines.

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

A court need not address all eight factors, nor must the plaintiff establish that each weighs in its favor to establish a likelihood of confusion. *See C & C Org. v. AGDS*, *Inc.*, 676 F. Supp. 204, 206 (C.D. Cal. 1987); *Network Automation, Inc. v. Advanced Sys. Concepts*, *Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) ("The Sleekcraft factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."); *Dreamwerks Prod. Grp.*, *Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The factors should not be rigidly weighed; we do not count beans."); *Eclipse Assoc. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination."). The Court addresses the *Sleekcraft* factors in the order presented by Hanginout.

### a.     Proximity or Relatedness of the Goods

"Related goods are those 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.' " *Sleekcraft*,

---

[20] The Court finds Hanginout's citation to *Taylor v. Thomas*, No. 2:12-CV-02309-JPM, 2013 WL 228033, (W.D. Tenn. Jan. 22, 2013) unavailing. The issue in *Taylor* was not whether the plaintiff had established sufficient use in a particular market, but whether ownership of a mark could be based on an assignment.

13cv2811 AJB (NLS)

599 F.2d at 348, n.10 (quoting *Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945)); *see also* 4 J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 24.24 (4th ed. 2002) ("Goods are 'related' if consumers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored or approved by the senior user."). "[T]he danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. *Id.*

Hanginout contends the products offered by Hanginout and Google directly overlap because they are both social-media based platforms offering the same services through the iTunes app store. To support this contention, Hanginout compares its pending trademark application, which lists computer application software, telecommunication services, audio, text, and video broadcasting, electronic messaging services, and providing online forums for communication as the marks uses, with information obtained from Google's website, wherein Google describes the HANGOUTS Q&A platform as allowing users to solicit questions from concurrent viewers, select and answer live questions, and timestamp a YouTube recording by marking questions as they are answered.

In opposition, Google contends that although the products contain some similar functions within the broad category of video communications, the purposes and functions of the products are neither identical nor interchangeable. For example, whereas HANGOUTS allows real-time, live video-conferencing, instant messaging, and other communications among multiple parties, HANGINOUT is merely a platform for posting and viewing pre-recorded video messages or video profiles. Furthermore, Google maintains that contrary to Hanginout's contentions, there is no such thing as the HANGOUTS Q&A application, instead HANGOUTS Q&A is a feature of Google's HANGOUTS ON AIR, which the host can turn on or off. Therefore, because the Q&A feature

1   is only related to HANGOUTS ON AIR, which is not the basis of this litigation, Google

2   argues the Q&A feature of HANGOUTS ON AIR is irrelevant.

3       Although the Court finds Google and Hanginout offer similar products under the

4   HANGOUTS and HANGINOUT marks, the Court finds the products have distinct

5   differences that change the functionality of the products. Therefore, because Hanginout

6   did not respond to Google's contention that the products are necessarily different based

7   on the fact that HANGOUTS offers real-time capabilities whereas HANGINOUT only

8   offers pre-recorded messaging and video features, this factor does not weigh in favor of

9   finding a likelihood of confusion.

10              **b.    Similarity of the Marks**

11      "[T]he more similar the marks in terms of appearance, sound, and meaning, the

12   greater the likelihood of confusion." *Brookfield*, 174 F.3d at 1054. "Where the two

13   marks are entirely dissimilar, there is no likelihood of confusion." *Id*. "Similarity of the

14   marks is tested on three levels: sight, sound, and meaning. Each must be considered as

15   they are encountered in the marketplace." *Sleekcraft*, 599 F.2d at 351 (citations omit-

16   ted).

17      Here, Hanginout contends that the marks at issue—HANGINOUT and HANG-

18   OUTS—are nearly identical in sight, sound, and meaning, and therefore, this factor

19   weighs in favor of finding a likelihood of confusion. *See*, *e.g. Banff*, *Ltd. v. Federated

20   Dep't Stores, Inc*., 841 F.2d 486, 491 (2d Cir. 1988) (finding a likelihood of confusion

21   between B WEAR and BEE WEAR for women's clothing); *Baker v. Simmons Co.*, 307

22   F.2d 458, 465 (1st. Cir. 1962) (finding SIMMONS and SIMMONS essentially identical

23   in sound). As would be expected, Google does not agree. Instead, Google maintains the

24   marks are significantly different because unlike *Banff* and *Baker*, the two decisions cited

25   by Hanginout, the marks are not phonetically identical. Google argues that whereas

26   HANGOUTS has two syllables, is plural, and is a noun; HANGINOUT has three

27   syllables, is singular, and describes an activity. These nonsensical arguments aside,

28   Google argues that given the actual appearance of the marks in commerce, in that the

Google name appears next to or close to any reference to HANGOUTS, no consumer is likely to be confused as to the product's origin.

Although the Court finds Google's final contention persuasive, in that marks must be considered as they will be encountered in the marketplace, *Lindy Pen Co.*, *v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984), the Court also finds that the marks are relatively similar in sight, sound, and meaning. Thus, although the marks have different design features associated with the words that define them, courts have found that where a trademark includes a combination of words and a design, "the word is normally accorded greater weight[] because it would be used by purchasers to request the goods." *L.C. Licensing*, *Inc. v. Cary Berman*, 86 U.S.P.Q.2d 1883, 2008 WL 835278, at *3 (T.T.A.B. 2008); *see also Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 1165 (Fed. Cir. 2002) ("The words dominate the design feature."). Accordingly, although Hanginout has not presented any evidence of actual consumer confusion (as detailed below), the Court finds this factor weighs slightly in favor of Hanginout.

### c.    Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353 (finding that confusion is likely due to the fact that both parties advertised in niche markets, including boat shows, speciality retail outlets, and trade magazines). "However, this factor becomes less important when the marketing channel is less obscure." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). Where both parties utilize the Internet to market the products at issue, the Ninth Circuit has found this factor carries little weight in the likelihood of confusion calculation. *See Playboy Enters.*, *Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight.").

Here, although Hanginout urges the Court to find that this factor weighs in favor of finding a likelihood of consumer confusion because there is a limited number of iTunes app store applications, the Court finds *Network Automation* and *Playboy* control-

ling. Therefore, Google and Hanginout's shared use of the Internet and iTunes app store to market their respective products weighs against a likelihood of confusion.

### d. Strength of the Plaintiff's Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058. Strength of a given mark is determined by measuring conceptual strength and commercial strength. *Network Automation*, 638 F.3d at 1149. "Conceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.' " *Id.* (quoting *Brookfield*, 174 F.3d at 1058). "A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Fortune Dynamic*, *Inc. v. Victoria's Secret Stores Brand Mgmt.*, *Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010). Once a mark has been placed on the conceptual strength spectrum, the court must then assess the marks commercial strength, i.e., whether the mark has actual "marketplace recognition." *Brookfield*, 174 F.3d at 1058 (stating that large advertising expenditures can transform a suggestive mark into a strong mark).[21]

Hanginout contends its marks are suggestive, if not stronger, because a "mental leap" is required to get from the term HANGINOUT to the product's features. *See Network Automation*, 638 F.3d at 1149 ("If a mental leap between the word and the product's attribute is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness."). Hanginout further argues that Google has admitted that the HANGINOUT mark is inherently distinctive because Google identified the mark on its trademark list as "HanginoutTM Messaging Service."[22] However, besides these two points, Hanginout does not address either marks commercial strength. In opposition,

---

[21] Hanginout confirmed at oral argument that this is not a reverse confusion case, which would necessitate a different analysis.

[22] Hanginout argues that designating a mark with a TM is an admission that the mark is distinctive.

Google asserts that the HANGINOUT mark is weak and the HANGOUTS mark is strong, which can be exemplified by the market penetration and actual use of the respective marks. Google further argues that Hanginout has an erroneous understanding of the meaning of the TM symbol, in that symbol reflects common law trademark rights not inherent distinctiveness.

The Court finds it telling that Hanginout failed to identify or discuss the commercial strength of the HANGINOUT mark, which is key to determining whether Google's marketing and advertising has resulted in a "saturation in the public awareness of [Hanginout's] mark," thereby reducing Hanginout's marketplace recognition. *A & H Sportswear*, *Inc. v. Victoria's Secret Stores*, *Inc.*, 237 F.3d 198, 231 (3d Cir. 2000). However, based on the evidence presented to the Court, it is apparent that Google has spent substantial time and substantial monies developing and promoting HANGOUTS, which has an installed base of millions of users.[23] Google has further represented that the HANGOUTS product has been featured by prominent magazines and websites, and that Google has invested substantial resources in media costs for advertising.[24] In contrast, Hanginout has failed to present any evidence as to the amount of money expended to develop, market, and/or promote HANGINOUT, and the only evidence of Hanginout's growth trends shows a 82% drop in the number of individuals who registered for the HANGINOUT iTunes application from 2012 to 2013.

Therefore, although the parties ardently dispute the marketplace recognition of their respective products, seemingly engaging in a popularity contest based on who utilized their products (Dalai Lama for Google and Shawne Merrriman for Hanginout), the Court finds Google is likely to overwhelm Hanginout's product line if the products are in competition with one another in the market due to Google's marketplace recognition. *See Cohn v. Petsmart*, *Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) ("Petsmart's extensive advertising gives it the ability to overwhelm any public recognition and

---

[23] For exact figures see Google's sealed opposition. (Doc. No. 34 at 1:20-25.)

[24] For exact figures see Google's sealed opposition. (Doc. No. 34 at 23-24.)

goodwill that Cohn has developed in the mark."). However, because the parties did not present any evidence as to how crowded the market actually is, and Hanginout cannot claim a right to all variants of the phrase in the given market, this factor does not weigh in favor of finding a likelihood of consumer confusion. *See SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012), appeal dismissed (Apr. 18, 2012) (recognizing that where the marks share a word or phrase but are otherwise different, the plaintiff is not permitted to claim a right to all variant of the phrase in a specific market).

### e. Evidence of Actual Confusion

"[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Playboy*, 354 F.3d at 1026 (citing *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002)) ("Evidence of actual confusion constitutes persuasive proof that future confusion is likely . . . If enough people have been actually confused, then a likelihood that people are confused is established."). "Actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act." *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (citing *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991)). Indeed, "[p]roving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Sleekcraft*, 599 F.2d at 352.

Here, Hanginout tries to articulate a basis for actual confusion when none in fact exists. Therefore, the Court finds this factor should be accorded no weight.[25] *See Network Automation*, 638 F.3d at 1151 ("Therefore, while this is a relevant factor for determining the likelihood of confusion in keyword advertising cases, its importance is diminished at the preliminary injunction stage of the proceedings."); *Rearden*, 597 F.

---

[25] Hanginout's only evidence of actual confusion is that consumers have used the phrase "Hanging out" and "Hangout" when referring to the HANGINOUT platform. However, Hanginout does not connect these references to Google's HANGOUTS mark. (Doc. No. 12 at 20:18-23.)

Supp. 2d at 1023, 1023 n.9 (stating that, while courts outside of the Ninth Circuit may consider confusion by others relevant, the Ninth Circuit's "precedents clearly hold that the key inquiry is confusion of prospective purchasers").

### f. Degree of Care Likely Exercised by Purchasers

"Low consumer care . . . increases the likelihood of confusion." *Playboy*, 354 F.3d at 1028. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . . . When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Sleekcraft*, 599 F.2d at 353 (citations omitted).

Here, Hanginout argues that because the products at issue are inexpensive (or for that matter free), it is likely that consumers are likely to register for the products without doing significant investigation. In opposition, Google contends that Hanginout has presented no evidence of the degree of sophistication of its customers, and that such an inference can not be made purely on the basis that the products are offered free of charge. Google also contends that because consumers will most likely select a product that their friends, family, and/or acquaintances are also using (or will be using), this factor does not automatically weigh in favor of Hanginout. Finally, Google contends that because viruses and spyware can potentially be included in free software, it cannot be assumed that the average consumer takes minimal care in downloading free software.

Although Google's final point is without merit, as Apple pre-screens all applications offered on the iTunes app store (either free or at a cost), the Court finds Google's first two points raise valid arguments. As recently explained by the Ninth Circuit in *Toyota Motor Sales*, *U.S.A.*, *Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010), when examining consumer confusion in the context of products offered over the Internet, the "relevant marketplace is the online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online . . . . Unreasonable, imprudent

and inexperienced web-shoppers are not relevant." *Id.* As a result, although it is true that courts originally presumed a low degree of care exercised by Internet consumers, the Ninth Circuit has cautioned against such a conclusory analysis and instructed lower courts to consider the "nature and the cost of the goods, and whether the products being sold are marketed primarily to expert buyers." *See Network Automation*, 638 F.3d at 1152 (citing *Brookfield*, 174 F.3d at 1060).

Accordingly, taking all of these factors into consideration: (1) the heightened degree of care of Internet consumers; (2) the fact that both products are offered free of charge; and (3) the fact that the applications offered via the iTunes app store indicated the source of the application, i.e., whether the application was offered by Google or Hanginout, the Court finds Hanginout has not presented sufficient evidence to support a finding that this factor weighs in favor of a likelihood of confusion.

### g.   Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. However, the Ninth Circuit has cautioned lower courts that this factor must be considered in light of whether the defendant's use of the trademark was to mislead consumers rather than truthfully inform them of their choice of products. *See Network Automation*, 638 F.3d 1153.

Hanginout contends Google intentionally adopted the HANGOUTS mark with full knowledge of the HANGINOUT mark because Google received the suspension notice from the USPTO of their trademark application on July 30, 2013, but nevertheless proceeded to launch the HANGOUTS iTunes application on September 12, 2013. Hanginout further argues that considering the shear size of Google, and the number of researchers, employees, and attorneys that work for Google, it seems highly improbable that Google had no knowledge of the HANGINOUT mark prior to releasing its HANG-OUTS iTunes application. In response, Google contends that its actions are not automat-ically indicative of bad faith because even after the USPTO alerted it of the existence of

Hanginout's pending trademark application in July 2013, it nonetheless believed it had superior common law rights and intended to challenge the mark.

Although the date Google submitted its trademark application for HANGOUTS closely correlates with the date Hanginout successfully had a third-party mark for HANGOUTS suspended due to lack of use, the Court does not find that Google adopted the HANGOUTS mark with the intent to deceive consumers.  Thus, to the extent Google believed it had superior common law trademark rights, the Court finds this fact does not weigh in favor of finding a likelihood of confusion.  *See SecuraComm Consulting*, *Inc. v. Securacom Inc*., 166 F.3d 182, 188 (3d Cir. 1999)

### h.    Likelihood of Expansion of the Product Line

"In asmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.  When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354 (citations omitted).  However, where two companies "already compete to a significant extent," this factor is unimportant.  *Brookfield*, 174 F.3d at 1060; *See Network Automation*, 638 F.3d 1153.

Hanginout contends that Google intends to directly compete with Hanginout in the social-media arena, and therefore, expansion is an established fact.  In opposition, Google contends that Hanginout's assertions should be afforded little weight because Hanginout has failed to present any evidence that either Google or Hanginout plans to expand into a different product areas.  *See Instant Media, Inc. v. Microsoft Corp*., No. C 07-02639 SBA, 2007 WL 2318948, at * 17 (N.D. Cal. Aug. 13, 2007) ("Nevertheless, in the absence of any concrete evidence that Microsoft plans to use the i'm mark in connection with the sort of product that would compete with the I'M player, this factor weighs slightly in Microsoft's favor.").

The Court agrees with Google that Hanginout has failed to present any evidence that it plans to expand into real-time video conferencing and messaging services, thereby

merging into and offering services/products in competition with Google. As a result, the Court finds this factor neither weighs in favor or against a finding of likelihood of consumer confusion.

Accordingly, after taking all the *Sleekcraft* factors into consideration, the Court finds Hanginout has failed to show that consumers will likely be confused by the two products at issue based on the evidence presently before the Court. This determination was made with special consideration to: (1) the strength of the marks; (2) evidence of actual confusion; (3) the type of goods and degree of care likely to be exercised by the purchaser; and (4) the labeling and appearance of the marks when offered to consumers through the iTunes app store.

### 2. Irreparable Harm

In addition to the factors outlined above, a plaintiff must establish irreparable harm to be entitled to immediate injunctive relief, i.e., that the plaintiff is unlikely to be made whole by an award of monetary damages or some other legal remedy within the ordinary course of litigation.[26] *See Am. Trucking Associations*, 559 F.3d at 1059. Speculative future harm is insufficient. *See Herb Reed Enters.*, 736 F.3d at 1250 (stating that the record below failed to support a finding of irreparable harm in the absence of evidence that such harm was likely rather than speculative); *see also Mortgage Elec. Registration Sys. v. Brosnan*, No. C 09-3600, 2009 WL 3647125, at *8, (N.D. Cal. Sept. 4, 2009) (citing *Stuhlbarg Intern. Sales Co.*, *Inc. v. John D. Brush and Co.*, *Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)) ("The potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm for purposes of preliminary injunctive relief."). Moreover, where there is a delay in time between the defendant's

---

[26] Although the standard for issuing a preliminary injunction in the trademark context previously presumed irreparable injury if the moving party showed a likelihood of success on the merits, district courts in this circuit have found the presumption no longer applicable. *See, e.g., Jumbo Bright Trading Ltd. v. Gap*, *Inc.*, No. CV12–8932, 2012 WL 5289784, at *1 (C.D. Cal. Oct. 25, 2012) ("As far as this court is aware, every district court in the Ninth Circuit that has examined the issue after *Flexible Lifeline . . .* has either found or at least suggested that irreparable harm cannot be presumed in trademark cases as well.") (collecting cases).

first alleged infringing use and the plaintiff's filing of the preliminary injunction, courts have found that a "lack of urgency" weighs against finding irreparable harm. *Oakland Tribune*, *Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Playboy Enters.*, *Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) ("[Plaintiff]'s [five-month] delay in seeking injunctive relief further demonstrates the lack of any irreparable harm.") *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Valeo Intellectual Prop.*, *Inc. v. Data Dep't Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) ("A three-month delay in seeking injunctive relief is inconsistent with [plaintiff]'s insistence that it faces irreparable harm.").

In the present case, Hanginout argues that it will suffer irreparable harm if an injunction does not issue because: (1) Google will continue to exploit Hanginout's goodwill; (2) Hanginout will lose the ability to police and control its brand and pending trademark applications; and (3) actual confusion, not just a likelihood of confusion, is already occurring. In opposition, Google contends any irreparable harm Hanginout alleges has or will continue to occur is displaced by Hanginout's failure to commence this litigation, or file the pending motion for preliminary injunctive relief, soon after it learned of Google's alleged infringing conduct. As a result, because Google first announced the release of HANGOUTS on June 28, 2011, but Hanginout did not file the instant litigation until November 26, 2013 (approximately 29 months later), or the pending motion for preliminary injunction until January 22, 2014 (approximately 31 months later), Hanginout's lack of urgency weighs against irreparable harm. Finally, Google contends that Hanginout has failed to offer any evidence that: (1) it has experi-enced a decline in customers/goodwill or that such a decline is likely; (2) that actual consumer confusion has occurred; and/or (3) that any immediate threatened injury exists.

Whether the Court considers Google's first-use date as of June 28, 2011 or May 2013 is irrelevant. Hanginout still waited anywhere between 29 months (June 2011) to 7 months (May 2013) before initiating the instant litigation, and even longer before filing the instant motion for preliminary injunctive relief. Some courts have found a delay

shorter than this—7 months—on its own, sufficient to weigh against a finding of irreparable harm. *See*, *e.g.*, *Edge Games*, *Inc. v. Elec. Arts*, *Inc.*, 745 F. Supp. 2d 1101, 1117–18 (N.D. Cal. 2010) ("The undisputed fact that plaintiff did not timely act to prevent the "Mirror's Edge" franchise from inundating the market is *alone* sufficient to deny the instant motion.") (alteration in original); *Playboy Enters.*, 55 F. Supp. 2d at 1090 (C.D. Cal. 1999) (stating the five month delay weighed against a finding of irreparable harm); *Valeo Intellectual Prop.*, 368 F. Supp. 2d at 1128 (stating that three month delay was inconsistent with a finding of irreparable harm). The Court also finds Hanginout's contention, raised at oral argument, that they did not file sooner because they did not believe Google intended to use the mark without merit.

Finally, even if the Court found the delay excusable, which is does not, Hanginout has failed to present any evidence that it has experienced a decline in customers or goodwill that occurred as a result of actual customer confusion. Allegations that the plaintiff has invested resources in developing its brand and that the alleged infringing conduct is denying the plaintiff the benefit of its investment is insufficient. *See Mytee Prods.*, *Inc. v. Shop Vac Corp.*, No. 13CV1610 BTM BGS, 2013 WL 5945060, at *6–7 (S.D. Cal. Nov. 4, 2013) ("Plaintiff has failed to establish that Defendant is causing irreparable harm that cannot be cured by money damages."). Accordingly, the Court finds Hanginout has failed to produce "probative, nonspeculative evidence" that it has "lost, or will likely lose, prospective customers or goodwill due to" Goggle's alleged infringing conduct. *Spiraledge*, *Inc. v. SeaWorld Entm't*, *Inc.*, No. 13 CV296-WQH-BLM, 2013 WL 3467435, at *4 (S.D. Cal. July 9, 2013); *see also ConocoPhillips Co. v. Gonzalez*, No. 5:12-CV-00576-LHK, 2012 WL 538266 (N.D. Cal. Feb. 17, 2012) (stating that if the "Plaintiff could wait eight months since becoming aware of the alleged trademark infringement before filing its ex parte application . . . Plaintiff can wait until Defendant has an opportunity to be heard").

///

///

### 3. Balance of Equities and the Public Interest

Finally, the Court finds the remaining two factors—balance of equities and public interest—also weigh in favor of denying Hanginouts's request for injunctive relief. In the trademark context, courts often define the public interest as the right of the public not to be deceived or confused. *See*, *e.g.*, *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001) (noting the public interest is served by avoiding confusion in the marketplace); *BellSouth Adver. & Publ'g Corp. v. The Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991) ("When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation.").

Therefore, in light of the findings set forth above, specifically Hanginout's failure to show market penetration in a specific geographic area and actual consumer confusion, the Court finds the balance of equities and the public interest weigh against granting Hanginout's motion for immediate injunctive relief. As noted by Google, it has expended substantial time and resources to develop and market the HANGOUTS mark, and requiring Google to re-brand the product on the evidence presented now would be unjust and potentially harm third-party developers as well as the public.

Accordingly, for the reasons stated above, Hanginout's motion to preliminarily enjoin Google from using the HANGOUTS mark is DENIED.

## II.    Motion to Dismiss

Similar to the arguments presented above, Google moves to dismiss the First Amended Complaint on the basis that Hanginout has failed to sufficiently allege seniority of use and market penetration in a specific geographic area.[27]  However, because obtaining preliminary injunctive relief and succeeding on a motion to dismiss require different quanta of proof, the Court does not assume Google's motion to dismiss

---

[27] Google contends Hanginout's state law claims fail for the same reasons its federal trademark infringement claims fail.

will be granted purely because Hanginout's motion for preliminary injunctive relief was denied.  *See Walker v. Woodford*, 454 F. Supp. 2d 1007, 1024 (S.D. Cal. 2006), *aff'd in part*, 393 F. App'x 513 (9th Cir. 2010).

## A.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations pleaded in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).  The court, however, is not bound to accept "legal conclusions" as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. (quoting *Twombly*, 550 U.S. at 557).  It is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that defendants have violated . . . laws in ways that have not been alleged."  *Associated Gen. Contractors of Cal.*, *Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## B.    Analysis

To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege that it owns a valid, protectable trademark, and that the defendant is using a

mark in commerce that is confusingly similar to the plaintiff's mark. *See* 15 U.S.C. § 1125(a); *Herb Reed Enters.*, 736 F.3d at 1247; *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). Although federal registration is not a prerequisite to an infringement claim, in the absence of federal registration, a plaintiff must plead that it is the senior user of the market and has sufficient market penetration in the area in which protection is requested. *See, e.g.*, *Adray*, 76 F.3d at 989 ("The extent of market penetration depends upon the volume of sales, the positive and negative growth trends, the number of people who purchased the party's goods in relation to the number of potential customers, and the amount of advertising"); *Glow*, 252 F. Supp. 2d at 983 ("Generally, the senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration."); *Optimal Pets*, 877 F. Supp. 2d at 958 ("A party asserting common law rights must not only establish that it is the senior user, it must also show that it has "legally sufficient market penetration" in a certain geographic market to establish those trademark rights"). Google contends Hanginout has failed in both regards.

### 1.   Priority of Use

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 *as modified*, 97 F.3d 1460 (9th Cir. 1996). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.* Courts must examine the totality of the circumstances when determining whether a mark has been adequately used in commerce so as to gain the protection of the Lanham Act. *See Chance*, 242 F.3d at 1159.

As discussed above, because Hanginout has alleged that it first used the HANGINOUT mark in commerce as early as March 2010, and had over 200 registered users of the web-based platform as early as May 2011, whereas Google did not begin using the HANGOUTS mark in commerce until June 28, 2011, assuming the Court

agreed with Google, the Court finds Hanginout has stated a plausible claim that it is the senior user of the mark in question. *See*, *e.g.*, *Allard Enterprises*, 146 F.3d at 358 ("As long as there is a genuine use of the mark in commerce, however, ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition."); *Dep't of Parks & Recreation*, 448 F.3d at 1126 ("Although mere advertising by itself may not establish priority of use, advertising combined with other non-sales activity, under our 'totality of the circumstances test,' can constitute prior use in commerce.") (internal citations omitted); *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, No. C08-04397 WHA, 2008 WL 6742224, at *2 (N.D. Cal. Dec. 18, 2008) (denying motion to dismiss in trademark case where moving party claimed priority because factual allegations in the complaint were inconsistent with the plaintiff's submissions to the USPTO); *Gulfstream Media Grp., Inc. v. PD Strategic Media, Inc.*, No. 12-62056-CIV, 2013 WL 1891281 at *5 (S.D. Fla. May 6, 2013) (stating the Court must wait to consider the evidence adduced later in the litigation to determine priority of use and whether that use constituted use in commerce).[28]

## 2.    Market Penetration in a Specific Geographic Area

"Sufficient market penetration is determined by 'examining the trademark user's volume of sales and growth, number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising' in a given market." *Credit One Corp.*, 661 F. Supp. 2d at 1138 (quoting *Glow*, 661 F. Supp. 2d at 1138); 5 McCarthy on Trademarks and Unfair Competition §26:13 (4th ed.) ("In the absence of federal registration, both parties have the right to expand into unoccupied territory and establish exclusive rights by being first in that territory. In effect, it is a race between the parties to establish customer recognition in unoccupied territory, possibly subject to the concept of a zone of natural expansion.").

---

[28] The Court also notes that none of the cases cited by Google with respect to this issue concerned a motion to dismiss pursuant to Rule 12(b)(6), in which the Court was required to accept the plaintiff's factual allegations as true.

Google asserts Hanginout has failed to sufficiently allege market penetration "in any single geographic location, let alone nationwide." (Doc. No. 23 at 7.) Google further claims that Hanginout "pleads no specific facts regarding its volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, the amount of its advertising prior to June 2011, or where the 200 alleged users were located." (*Id*.) In opposition, Hanginout contends Google completely ignores the pleading standard and what is required to defeat a motion to dismiss. Therefore, Hanginout asserts that Google's efforts are premature, and "[w]hile Google may explore the depths of Hanginout's allegations as litigation and discovery progress," such an inquiry is not appropriate on a motion to dismiss.

The Court agrees. Although Hanginout has failed to present sufficient evidence of its market penetration in a specific geographic area to warrant preliminary injunctive relief at this juncture, on a motion to dismiss, the Court must take the plaintiff's allegations as true, and construe the facts in the light most favorable to the plaintiff. *Cahill*, 80 F.3d at 337–38; *Ashcroft*, 556 U.S. at 678 (stating that while a plaintiff need not "plead every detail or prove every fact," a plaintiff must allege certain facts, which if true, would state a plausible claim for relief). Therefore, because Hanginout has alleged that it "achieved market penetration through the United States and, at a minimum, in California," the Court must take these facts as true and leave for a later date the determination of whether Hanginout will be able to support such facts with the necessary evidence. *See Monster Daddy, LLC v. Monster Cable Prods., Inc.*, No. CA 6:10-1170-TMC, 2012 WL 2513466, at *2-3 (D.S.C. June 29, 2012) (denying 12(b)(6) motion in trademark case on grounds that it was not appropriate for the court to make factual determinations at that time) (denying 12(b)(6) motion in trademark infringement case on the basis that it was inappropriate for the court to make factual determinations on a motion dismiss); *CYBERsitter, LLC v. Google Inc.*, 905 F. Supp. 2d 1080, 1087 (C.D. Cal. 2012). Accordingly, the Court DENIES Google's motion to the dismiss the First Amended Complaint.

## CONCLUSION

As set forth above, the Court DENIES Hanginout's motion for preliminary injunction, (Doc. No. 12), and DENIES Google's motion to dismiss the First Amended Complaint, (Doc. No. 23).  Google must file an answer to the operative complaint no later than thirty (30) days from the date of this order.


IT IS SO ORDERED.

DATED:  May 12, 2014

_____
Hon. Anthony J. Battaglia
U.S. District Judge